# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION

### CIVIL CASE NO. 1:09cv312

| | |
|---|---|
| TEXTRON FINANCIAL CORP., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **O R D E R** |
| | ) |
| SEVEN FALLS GOLF AND RIVER CLUB, LLC; KEITH VINSON; and PAULA VINSON, | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**THIS MATTER** is before the Court on Textron Financial Corporation's Motion Pursuant to Rule 56 for Partial Summary Judgment Against Seven Falls Golf and River Club, LLC and Against Keith Vinson and Paula Vinson. [Doc. 44]. For the reasons set forth herein, the Motion will be allowed.

## I.    PROCEDURAL BACKGROUND

The Plaintiff Textron Financial Corporation ("Textron") brought this civil action against the Defendants Seven Falls Golf and River Club, LLC ("Seven Falls") and Keith Vinson and Paula Vinson (collectively, the "Vinsons"), alleging claims for breach of contract, conversion, and claim

and delivery arising from the alleged breach of two leases by Seven Falls and the alleged breaches of the Vinsons as guarantees of Seven Falls's obligation under those leases. [Amended Complaint, Doc. 6]. The Defendants answered the Amended Complaint on December 7, 2009. [Answer, Doc. 22]. Thereafter, the Court granted Textron's motion for claim and delivery, and an Order for Claim and Delivery was entered on May 3, 2010. [Doc. 37].

Textron now moves for summary judgment as to liability and damages on its breach of contract claims against Seven Falls and the Vinsons. [Doc. 44]. The Defendants have not responded to Textron's motion.

## II.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no *genuine* issue of *material* fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d (1986)) (emphasis in original). A genuine issue of fact exists if "a reasonable jury could return a verdict for the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994) (citation omitted).

"Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. Id.

> A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. Furthermore, neither unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

Id. (internal citations and quotation marks omitted).

The Defendants here have failed to respond to the Plaintiff's Motion, and therefore, the Court shall consider the facts presented by the Plaintiff to be undisputed. See Fed. R. Civ. P. 56(e)(2). "Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to a 'judgment as a matter of law.'" Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993). "Therefore, even when the adverse party fails to respond to the motion for summary judgment, the court must review the motion and the materials before the court to determine if the moving party is entitled to summary judgment as a matter of law." Meyer v. Qualex, Inc., 388 F. Supp. 2d 630, 634 (E.D.N.C. 2005); see also Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.").

In considering the facts for the purposes of a summary judgment motion, the Court will view the pleadings and material presented in the light

most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor.  George & Co. LLC v. Imagination Entertainment Ltd., 575 F.3d 383, 392 (4th Cir. 2009).


### III.    FACTUAL BACKGROUND

In light of the Defendants' failure to respond to Textron's Motion for Partial Summary Judgment, the following facts are not in dispute.

### A.    The Master Lease Agreements

In 2008, Textron and Seven Falls entered into two Master Lease Agreements (the "June 9 Lease" and the "December 16 Lease"; collectively, the "Leases").  [Leases, Doc. 6-2 at 2 and 28; Affidavit of Charles Gibson dated September 3, 2009 ("First Gibson Aff."), Doc. 11-2 at ¶3].  As is pertinent to the present Motion, the Leases each provide in paragraph 4 as follows:

> **Rent:** You [Seven Falls] will pay us rent in the amount(s) and at the frequency specified in the applicable Schedule(s), without abatement for any reason. The first rental payment will be specified on the applicable Schedule(s) of this Lease. Subsequent rental payments will be due on the day of the month specified in the Schedule. IF ALL OR PART OF A RENTAL PAYMENT IS NOT PAID WHEN DUE, WE MAY CHARGE YOU THE GREATER OF $25.00 OR 10% OF THE AMOUNT PAST DUE.  We will

> determine the order in which your payments are
> applied to your outstanding obligations ("Obligations")
> owing to us.

[Affidavit of Charles Gibson dated September 16, 2010 ("Second Gibson

Aff."), Doc. 45-2 at ¶3; Leases, Doc. 6-2 at ¶4 (emphasis in original)].

Pursuant to the Leases, Textron paid for numerous pieces of

equipment (the "Equipment"), which were delivered to Seven Falls in

different lots over several months. The Equipment was used principally in

maintaining a golf course. [First Gibson Aff., Doc. 11-2 at ¶5]. Textron and

Seven Falls documented the delivery of the Equipment to Seven Falls by

way of the Schedules referenced in paragraph 4 of the Leases. [First

Gibson Aff., Doc. 11-2 at ¶ 6; Seven Falls' Deemed Admissions Nos. 5 and

6, Doc. 45-3 at 67].[1] In addition to identifying the Equipment delivered to

and accepted by Seven Falls, each Schedule sets forth the payment terms

for rent for the Equipment delivered to Seven Falls pursuant to that

Schedule. [Second Gibson Aff., Doc. 45-2 at ¶4; Schedules, Doc. 6-2 at 6,

---

[1]Textron served requests for admission on Seven Falls, but Seven Falls never served a response. [See Affidavit of Rodney E. Alexander ("Alexander Aff."), Doc. 45-3 at ¶¶3-8]. Accordingly, Seven Falls is deemed to have admitted each matter inquired into in the requests for admission. See Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney.").

32]. Table 1 in the Second Gibson Affidavit summarizes, among other

information, Seven Falls's monthly rental obligations pursuant to the

Schedules. [Second Gibson Aff., Doc. 45-2 at ¶5].

In addition to agreeing to make monthly rental payments, Seven Falls

further agreed to pay all taxes and other fees in connection with the leased

Equipment. Specifically, the Leases provide, in pertinent part, as follows:

> You [Seven Falls] are responsible for all taxes and
> other fees imposed in connection with the Lease, use
> or ownership of the Equipment (including sales, use
> and property taxes). If we [Textron] have title to the
> Equipment, we will pay the applicable property taxes.
> We will either ask you to reimburse us for the amount
> that we pay or we will estimate the annual charge and
> bill you a ratable portion with each rental payment.

[Second Gibson Aff., Doc. 45-2 at ¶6; Leases, Doc. 6-2 at ¶10]. As

reflected in the June 9 Lease, Seven Falls elected to participate in the

"Property Tax Fee Program," pursuant to which Seven Falls agreed to pay

Textron a monthly fee based on a percentage of the total cost of the

Equipment in lieu of paying actual property taxes on the Equipment.

[Second Gibson Aff., Doc. 45-2 at ¶7; June 9 Lease, Doc. 6-2 at ¶10].

### B. The Vinsons' Guarantees

Defendants Keith Vinson and Paula Vinson each executed a

Guaranty Agreement in which they individually guaranteed the timely

7

performance of all obligations of Seven Falls under the Leases. [Second

Gibson Aff., Doc. 45-2 at ¶¶8-9; Guaranty Agreements, Doc. 6-5; Answer,

Doc. 22 at ¶¶19, 50].[2]  In paragraph 1 of the Guaranty Agreements, the

Vinsons agreed, among other things: (1) that they were executing the

Guaranty Agreements to induce Textron to provide financial

accommodation to Seven Falls and to enter into other agreements with

Seven Falls; (2) that they irrevocably and unconditionally guaranteed the

prompt payment of all of Seven Falls's indebtedness, obligations and

liabilities to Textron; (3) that the Guaranty Agreement was a guarantee of

payment and not a guaranty of collection; (4) that Textron could proceed

---

[2]Textron asserts that in her answers to interrogatories (which do not appear to be a part of the record before the Court), Paula Vinson denied signing the Guaranty Agreement.  In the Answer, however, Ms. Vinson and the other Defendants collectively twice admitted that (i) Keith and Paula Vinson executed certain guaranty agreements, and (ii) that purported copies of certain guaranty agreements were attached to Plaintiff's First Amended Complaint as Exhibit 4. [Answer, Doc. 22 at ¶¶19, 50].  A party's admissions in the pleadings are binding on the parties unless allowed by the Court to be withdrawn. Meyer v. Berkshire Life Ins. Co., 372 F.3d 261, 264 (4th Cir. 2004) (noting that a judicial admission, unless allowed to be withdrawn, "is conclusive in the case"); Bright v. QSP, Inc., 20 F.3d 1300, 1305 (4th Cir. 1994) (stating that "even if the post-pleading evidence conflicts with the evidence in the pleadings, admissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions").  Moreover, it is well-settled in the Fourth Circuit that a genuine issue of material fact does not arise where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct. See Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir.1984).  In light of the fact that the Defendants never sought leave to amend their Answer to withdraw their admission that the Vinsons executed the Guaranty Agreements at issue, the Court will disregard Ms. Vinson's responses to interrogatories and consider the admissions in her Answer binding and conclusive of the issue of her due execution of the Guaranty Agreement.

against the Vinsons under the Guaranty Agreements without first proceeding against Seven Falls; (5) that Textron was at liberty to deal with Seven Falls and any other party liable in any manner for any of Seven Falls's debt to Textron without affecting the Vinson's obligations under the Guaranties; and (6) that they waived notice of the modification or extension of any of Seven Falls's debt to Textron, notice of default or other non-performance by Textron, and notice of the repossession, transfer or disposition of any of the Equipment. In paragraph 2, the Vinsons further agreed that the Guaranty Agreements were continuing in nature and only could be revoked prospectively by giving written notice to Textron. In paragraph 3, the Vinsons agreed that they waived, among many other rights, any right to require Textron to institute suit or exhaust remedies against Seven Falls or any other party liable for Seven Falls's debt to Textron. Finally, in paragraph 5, the Vinsons agreed to reimburse Textron for any expenses incurred in enforcing the Guaranty Agreements, including in-house attorney and paralegal fees and outside attorney and paralegal fees. [Guaranty Agreements, Doc. 6-5 at ¶¶1-3, 5]. Textron has no record of receiving a revocation of either of the Guaranty Agreements [Second

Gibson Aff., Doc. 45-2 at ¶11], and neither of the Vinsons has offered any evidence of revocation.

### C.    Seven Falls's Default

In support of its Motion for Partial Summary Judgment, Textron has submitted Payment History Reports relating to each Schedule to the Leases.  These Reports summarize the charges to Seven Falls, as well as all payments by or on behalf of Seven Falls to Textron under the Leases.  [See id. at ¶¶12-16; Seven Falls' Deemed Admission No. 15, Doc. 45-3 at 70].  According to the Schedules, from February 15, 2009 through at least the date of the filing of the present Motion, Seven Falls was obligated to make lease rental payments to Textron each month in the total amount of $17,246.58, plus an amount estimated to cover taxes.  [Second Gibson Aff., Doc. 45-2 at ¶¶5, 18].  With the exception of a payment of less than one month's rental obligation which Textron received in December 2009 after Textron had filed this lawsuit, however, Seven Falls failed to make any payments to Textron after May 29, 2009.  [Id. at ¶¶14-16 and 21; Payment History Reports, Doc. 45-3 at 34-61].[3]  As a result of Seven

---

[3]These Payment History Reports are Textron business records and appear to qualify as records of regularly conducted activity pursuant to Fed. R. Evid. 803(6). Pursuant to Fed. R. Evid. 803(7), the absence of an entry in these Payment History Reports is admissible to show that Textron did not receive the payments from Seven

Falls's default, Textron sent a letter dated July 1, 2009, in which Textron notified Seven Falls and the Vinsons that Textron was accelerating the payment obligations owing under the Leases and demanded, among other things, that Seven Falls and each of the Vinsons pay all amounts owing under the Leases. [Second Gibson Aff., Doc. 45-2 at ¶22, Letter, Doc. 6-7 at 2]. When neither Seven Falls nor the Vinsons made the payments as requested in the July 1, 2009 letter, Textron's counsel sent another letter to the Defendants on August 6, 2009, advising them yet again of the default and requesting immediate payment and return of the Equipment. [Letter, Doc. 6-8 at 2]. Neither Seven Falls nor the Vinsons has paid to Textron the amounts owed pursuant to the Leases and the Guaranty Agreements. [Second Gibson Aff., Doc. 45-2 at ¶23].

### D.    Recovery of the Equipment

On March 25, 2010, the Court entered an Order granting Textron's Motion for Clam and Delivery. [Doc. 29]. Thereafter, on May 3, 2010, it entered an Order for Claim and Delivery. [Doc. 37]. On May 24, 2010, Textron took possession of the Equipment identified in the Order for Claim and Delivery. Textron incurred costs of $4,015.00 in taking possession of

---

Falls. See In re Apex Express Corp., 190 F.3d 624, 635 (4th Cir. 1999).

the Equipment and transporting the Equipment to Liberty, South Carolina. [Second Gibson Aff., Doc. 45-2 at ¶32]. Furthermore, Textron incurred costs of $9,250.00 in storing the Equipment. [Id. at ¶33].

On June 7, 2010, Textron notified Seven Falls that Textron intended to sell a portion of the Equipment. [Alexander Aff., Doc. 45-3 at ¶10]. Thereafter, Textron sold a significant portion of the Equipment and received $282,925.00 as a result of the sale. [Second Gibson Aff., Doc. 45-2 at ¶34].

## IV.    ANALYSIS

### A.    Substantive Law To Be Applied

In this diversity action, the Court is obliged to apply the substantive law of North Carolina, including its choice-of-law rules. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Both the Leases and Guaranty Agreements at issue provide that the contracts are to be construed in accordance with the law of the state of Rhode Island. [See Leases, Doc. 6-2 at ¶19; Guaranty Agreements, Doc. 6-5 at ¶5]. Under North Carolina law, "where parties to a

contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). Thus, pursuant to the choice-of-law provisions set forth in the Leases and Guaranty Agreements, the Court shall apply the law of the State of Rhode Island in interpreting and enforcing these contracts.

Under Rhode Island law, the issue of contract interpretation is generally a question of law for the Court. Dubis v. East Greenwich Fire Dist., 754 A.2d 98, 100 (R.I. 2000); accord Harris v. Ray Johnson Constr. Co., 139 N.C. App. 827, 829, 534 S.E.2d 653, 654 (2000). Where the language of a contract "is plain and unambiguous, its meaning should be determined without reference to any extrinsic facts or aids." Cathay Cathay, Inc. v. Vindalu, LLC, 962 A.2d 740, 746 (R.I. 2009) (quoting Clark-Fitzpatrick, Inc./Franki Foundation Co. v. Gill, 652 A.2d 440, 443 (R.I. 1994)). "In determining whether a contract is clear and unambiguous, the document must be viewed in its entirety and its language be given its plain, ordinary and usual meaning." Paradis v. Greater Providence Deposit Corp., 651 A.2d 738, 741 (R.I. 1994). As the Rhode Island Supreme Court has explained, "a contract is ambiguous only when it is reasonably and clearly

13

susceptible of more than one interpretation." Id. As such, "the construction of a clear and unambiguous contract presents an issue of law which may be resolved by summary judgment . . . ." Lennon v. MacGregor, 423 A.2d 820, 822 (R.I. 1980); accord Bollech v. Charles County, 69 F. App'x 178, 180 (4th Cir. 2003).

### B. Seven Falls's Liability Under the Leases

In order to establish a breach of contract under Rhode Island law, a plaintiff must establish the existence of a valid contract and a breach of that contract's terms. See, e.g., Gorman v. St. Raphael Acad., 853 A.2d 28, 33 (R.I. 2004).

With respect to Textron's breach of contract claim against Seven Falls, there is no dispute that the Leases are valid and existing contracts. The testimony of Charles Gibson, as set forth in his Affidavit of September 16, 2010, establishes the existence of the Leases, and Seven Falls has admitted the existence and due execution of the Leases. [First Gibson Aff., Doc. 11-2 at ¶3; Answer, Doc. 22 at ¶10; Seven Falls's Deemed Admissions Nos. 1-4, Doc. 45-3 at 66-67].

Moreover, Textron has presented a forecast of evidence to establish that Seven Falls failed to make the lease payments when due and failed to

pay as demanded in the July 1 and August 6, 2009 letters [Second Gibson

Aff., Doc. 45-2 at ¶¶17, 21, 23, 25; Payment History Reports, Doc. 45-3 at

34-61; Answer, Doc. 22 at ¶¶25, 32; Seven Falls's Deemed Admission No.

12, Doc. 45-3 at 69].  As there are no genuine issues of material fact as to

either the existence or validity of the Leases or Seven Falls's breach of its

obligations under the Leases, the Court concludes that Textron is entitled to

summary judgment against Seven Falls as to liability for breach of contract.

### C.    The Vinsons' Liability Under the Guaranty Agreements

In order to establish its claim against the Vinsons, Textron must

establish (1) the existence of a contract of guaranty and (2) a breach of that

contract.  See Williams & Flash Co. v. Carpenter, 32 R.I. 349, 79 A. 821,

824 (1911) (noting that plaintiff has burden of proof to show existence of

contract of guaranty and breach in order to prevail on breach of guaranty

claim).

In the Guaranty Agreements, the Vinsons each agreed, among other

things: (i) that they would "irrevocably and unconditionally guarantee" to

Textron the prompt payment of all indebtedness, obligations and liabilities of

Seven Falls; (ii) that the Guaranty Agreement was a guaranty of payment

and not a guaranty of collection; and (iii) that Textron could proceed against

the Vinsons under the Guaranty Agreements without first proceeding against Seven Falls.  [Second Gibson Aff., Doc. 45-2 at ¶¶9-10; Guaranty Agreements, Doc. 6-5 at ¶¶1-3].

As previously noted, the Defendants have admitted that Keith and Paula Vinson executed the Guaranty Agreements.  Furthermore, Textron has presented an undisputed forecast of evidence to establish that the Vinsons have failed to pay Textron in accordance with the requirements of the Guaranty Agreements.  Because there are no genuine issues of material fact as to (i) the existence or the terms of the Guaranty Agreements or (ii) the Vinsons' breach of their obligations under those agreements, the Court concludes that Textron is entitled to summary judgment against the Vinsons as to liability for breach of contract.

### D.    Textron's Damages

Summary judgment with respect to damages is appropriate when there is no genuine issue of material fact regarding the amount of damages claimed.  See Horner Millworks Corp. v. Pinnacle Homes, Ltd., 726 A.2d 464, 465 (R.I. 1999) (affirming summary judgment where evidence regarding amounts owed under guaranty agreement was not disputed); accord Symons Corp. v. Quality Concrete Constr., Inc., 108 N.C. App. 17,

16

22-24, 422 S.E.2d 365, 368-69 (1992). "Once a party has established the fact of damages, a court may estimate damages based on just and reasonable inferences drawn from the evidence submitted." Pine Ridge Coal Co. v. Local 8337, United Mine Workers of Am., 187 F.3d 415, 421 (4th Cir. 1999).

### 1.    Lost Rental Damages

As is relevant to Textron's claim for lost rental damages, Paragraph 13 of each of the Leases provides, in pertinent part, as follows:

> **REMEDIES AND RECOVERY COSTS:** Upon your default under this Lease, you will promptly compensate us for the loss of our bargain (the "Damages"). The amount of the Damages will be determined as of the time that you make payment to us for the damages and will be equal to the sum of: (a) all past due amounts owing under this Lease, (b) an estimate of any property tax which we will owe for the Equipment, [and] (c) all amounts due and yet to become due under this Lease . . . .

[Second Gibson Aff., Doc. 45-2 at ¶24; Leases, Doc. 6-2 at ¶13].

Textron has presented a forecast of evidence to show that Seven Falls owes to Textron a total of $249,279.53 for amounts owed but unpaid as of December 22, 2009; a total of $522,421.74 for the future amount of rent that Seven Falls was obligated to pay under the Leases which otherwise would have been due after December 22, 2009 (discounted to

17

present value as of December 22, 2009, in accordance with paragraph 13 of the Leases); and a total of $15,263.63 for the amount of estimated property tax that Textron will owe for the Equipment, resulting in a total of $786,964.90 in lost rental damages.  [Second Gibson Aff., Doc. 45-2 at ¶26].

## 2.    Recovery and Storage Fees

With respect to Textron's claim for recovery and storage fees, Paragraph 13 of each of the Leases provides that Seven Falls would be "responsible for all recovery costs that [Textron] incur[s] after a default." [Second Gibson Aff., Doc. 45-2 at ¶24; Leases, Doc. 6-2 at ¶13].   Textron has presented an undisputed forecast of evidence to show that when it took possession of the Equipment identified in the Order for Claim and Delivery on May 24, 2010, it incurred costs of $4,015.00 in taking possession of the Equipment and transporting it to Liberty, South Carolina, and costs of $9,250.00 in storing the Equipment.  [Second Gibson Aff., Doc. 45-2 at ¶¶ 32, 33].

## 3.    Sale Proceeds

Pursuant to Paragraph 13 of the Leases, if Textron sells or re-leases any of the Equipment upon repossession, Textron is required to credit

Seven Falls "for the present value of the sale or re-lease proceeds." [Leases, Doc. 6-2 at ¶13]. The undisputed forecast of evidence presented by Textron establishes that Textron sold a significant portion of the Equipment following repossession and received $282,925.00 as a result of the sale. [Second Gibson Aff., Doc. 45-2 at ¶ 34]. The reasonableness of this amount is not in dispute. Accordingly, Seven Falls is entitled to a credit in this amount against the amounts owed under the Leases.

Based upon the undisputed forecast of evidence presented by Textron, the Court concludes that Textron is entitled to the following damages:

| | |
|---|---|
| Lost Rental Damages | $786,964.90 |
| Recovery Costs | 4,015.00 |
| Storage Costs | 9,250.00 |
| Sale Proceeds | <282,925.00> |
| **TOTAL DAMAGES** | **$517,304.90** |

There being no disputed issue of material fact relating to Textron's damages resulting from Seven Falls's breach of contract, the Court concludes that Textron is entitled to judgment as a matter of law in the amount of

$517,304.90 against Seven Falls under the Leases and against each of the Vinsons pursuant to the Guaranty Agreements.

### E.    Textron's Attorneys' Fees

In paragraph 5 of the Guaranty Agreements, each of the Vinsons agreed to reimburse Textron for any expense incurred by Textron in enforcing the guaranty, including in-house attorney and paralegal fees and outside attorney and paralegal fees.  [Guaranty Agreements, Doc. 6-5 at ¶5].  Similarly, paragraph 13 of the Leases provides, in pertinent part, as follows:

> With respect to any default under this Lease, you will reimburse us for all costs and expenses incurred by attorneys, including both our in-house attorneys and outside attorneys and paralegals whether or not a lawsuit or other court action is actually filed in connection with the event of default. In the event a suit, action, arbitration, or other proceeding of any nature, including, without limitation, any proceeding under The Bankruptcy Code, any action seeking a declaration of rights or an action for rescission is instituted to interpret or enforce this Lease, including but not limited to such fees and costs associated with trial and appeals, you agree to pay the reasonable attorneys fees incurred in connection with such proceeding as awarded by the court....

[Leases, Doc. 6-2 at ¶13].

The Rhode Island Supreme Court has held that "[g]iven a proper contractual, statutory, or other legal basis to do so, the award of attorney's fees rests with the sound discretion of the trial [court]." Women's Dev. Corp. v. City of Central Falls, 764 A.2d 151, 162 (R.I. 2001). In determining the amount of reasonable attorneys' fees to be awarded, courts typically apply the lodestar method, whereby the number of reasonable hours expended is multiplied by a reasonable hourly rate. See Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Under Rhode Island law, a trial judge determines whether a fee is reasonable by considering the factors enumerated in Rule 1.5 of the Rhode Island Supreme Court Rules of Professional Conduct. See Keystone Elevator Co. v. Johnson & Wales Univ., No. M.P. 00-767, C.A. 00-406, 2004 WL 2813744, at *2 (R.I. Super. Sep. 14, 2004) (citing Colonial Plumbing & Heating Supply Co. v. Contemporary Constr. Co., 464 A.2d 741, 743 (R.I. 1983)). These factors include:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

Keystone Elevator, 2004 WL 2813744, at *2.

### 1.    Time and Labor Required, the Novelty and Difficulty of the Questions Involved, and the Skill Required to Perform the Legal Service Properly

Attached to Mr. Alexander's Affidavit are billing records for the fees Textron has incurred with the law firm of Mayer Brown LLP and Alexander Ricks PLLC in connection with Textron's efforts to recover under the Leases and the Guaranty Agreements for the time period of August 4, 2009 through September 17, 2010.[4]  These records show that between August 4, 2009 and September 14, 2009, Mayer Brown attorneys expended 40.9 hours of

---

[4]Until September 15, 2009, Textron's lead counsel, Rodney Alexander, was an equity partner with Mayer Brown.  When Mr. Alexander withdrew from the Mayer Brown partnership and joined the law firm of Alexander Ricks, Textron continued to retain him to represent its interest in this case.

attorney time.  Specifically, these attorneys investigated the facts; reviewed documents; drafted and filed the original and amended complaints; and drafted and filed Textron's motion for claim and delivery and supporting memorandum of authorities, resulting in Textron incurring attorneys' fees and expenses of $24,370.97.  [Alexander Aff., Doc. 45-3 at 6-7].

These billing records further show that between September 16, 2009 and September 17, 2010, attorneys and paralegals at Alexander Ricks devoted 290.2 hours to pursuing recovery from the Defendants on Textron's behalf.   During that time, Alexander Ricks attorneys investigated the facts and conferred with the client; reviewed documents; drafted and filed the report of the initial attorneys' conference; drafted and filed various motions and proposed orders; researched the possibility of obtaining relief from automatic stays or obtaining dismissal of the Seven Falls's bankruptcy cases; drafted two separate motions for relief from stay in connection with Seven Falls's bankruptcy filings; prepared for and attended two separate hearings on the motions for relief from the automatic stay; attended the hearing on Textron's motion for claim and delivery and other hearings; prepared various documents for submission to the Court in connection with the Order granting claim and delivery; negotiated with Defendants' counsel

and drafted numerous emails to Defendants' counsel regarding the claims in this case and possible settlement; drafted written discovery to the Defendants; received and reviewed Defendants' responses to the written discovery; and drafted the present motion for summary judgment and supporting memorandum of authorities.  The vast majority of that time, 250.2 hours, was for the services of Mr. Alexander.  Leslie Wagstaff, a contract attorney who routinely provides services for Alexander Ricks, devoted 29.7 hours to the case, primarily on researching various issues relating to recovering from Seven Falls and to obtaining relief from the automatic stay.  Contract paralegals devoted 10.3 hours to the matter, primarily on managing electronic filings and documents.  In total, Textron incurred attorneys' fees and expenses with Alexander Ricks totaling $95,394.44.  [Id. at 7].

While this case did not present particularly novel or difficult questions of law, the Court notes that there were some procedural aspects of the case that were unusual.  For example, Textron pursued the North Carolina state remedy of claim and delivery in federal court.  Additionally, Seven Falls twice filed for bankruptcy protection, which required Textron's counsel to twice file motions for relief from the automatic stay and to twice seek

dismissal of the bankruptcy proceedings.  The bankruptcy proceedings presented some rather complicated issues relating to the characterization of the Leases as true leases or financing agreements, which required a somewhat higher level of knowledge and experience by counsel.  For these reasons, the Court finds that the issues presented in this case required the services of attorneys possessing considerable experience in sophisticated civil litigation, and that the amount of time expended by the attorneys in this case was reasonable.

### 2.    The Preclusion of Other Employment by the Lawyer

Counsel did not have to decline any representation solely because of the services rendered to Textron in this matter.  As such, this factor is not applicable here.

### 3.    Customary Fee Charged in the Locality

During the time that Textron was represented by Mayer Brown, Textron was charged: (i) $559 per hour for the work of Mr. Alexander; (ii) $338 per hour for the work of Jasmine C. Marchant, an associate who graduated from The George Washington University Law School in 2006; (iii) $456 per hour for the work of Ajanaclair Lynch, an associate who graduated from Brooklyn Law School in 2004, and who is in Mayer Brown's finance

practice group and has expertise in secured transactions; and $211 per hour for the work of Karen Pruitt, a paralegal. [Alexander Aff., Doc. 45-3 at 9].[5]

During the time that Textron was represented by Alexander Ricks, Textron was charged $350 per hour for the work of Mr. Alexander; $150 per hour for the work of Ms. Wagstaffs; and $90.00 per hour for the work of contract paralegals.

Based upon the Court's own familiarity with hourly rates charged in this District, the Court finds that the hourly rates sought herein for lawyers at Alexander Ricks are commensurate with the rates charged by other practitioners of similar experience and abilities in the Western District of North Carolina. The rates claimed, however, for the work performed on this case by Mayer Brown attorneys, as well as by paralegals at both firms, are in excess of the prevailing market rates in this District for litigation of this type. Based upon the Court's own knowledge of and experience with the relevant market, the Court therefore will base that portion of the fee award attributable to the work of the Mayer Brown attorneys and the paralegals at

---

[5]The billing records indicate that Textron also charged $681.50 per hour for the work of David Wiles, who worked .80 hours on the case. Mr. Alexander's Affidavit makes no reference to Mr. Wiles's background or qualifications.

both firms based on the following rates: attorney Rodney Alexander: $350 per hour; attorney David Wiles: $350 per hour; attorney Ajanaclair Lynch: $300 per hour; attorney Jasmine Marchant: $225 per hour; and paralegals: $75 per hour.

### 4.  Amount Involved and Results Obtained

The amount involved in this case, exclusive of attorneys fees, is approximately $790,000 before mitigation.

### 5.  Time Limitations Imposed

There were no unusual time limitations affecting the work performed. Accordingly, this factor is not applicable here.

### 6.  Nature and Length of Professional Relationship with Client

Alexander Ricks has been representing Textron since September 2009.  Alexander Ricks did not make any adjustment to its rates to account for the nature or length of its relationship with Textron.  Mayer Brown provided Textron with a ten percent discount off of Mayer Brown's customary rates.

### 7. Experience, Reputation, and Abilities of Lawyers Involved

During the time that Mayer Brown rendered services to Textron, Mayer Brown was one of the ten largest law firms in the world. The reputation of Mayer Brown's attorneys is recognized and respected internationally and in North Carolina. While a considerably smaller firm, Alexander Ricks' attorneys are each former Mayer Brown lawyers and each graduated near the top of his or her law school class.

### 8. Whether the Fee is Fixed or Contingent

All fees for professional services in this case were provided on an hourly basis. Had counsel taken this case on a contingent fee basis, they would have been entitled to as much as forty percent of the gross recovery. Based on Textron's damages in this case of approximately $517,000, a 40% contingency fee would have resulted in payments to attorneys in excess of $206,800, which is significantly more than the fees that Textron has incurred in this case.

After careful consideration of Mr. Alexander's Affidavit and the supporting documentation filed therewith, and having carefully weighed each of the factors enumerated in Rule 1.5 of the Rhode Island Supreme Court Rules of Professional Conduct, the Court concludes that the fees and

incurred by Textron in this case, as reduced by this Court, are reasonable and that the fees and expenses charged in this case, as reduced, are commensurate with fees and expenses charged for similar work in complex commercial cases.  Accordingly, the Court, in its discretion, concludes that Textron shall be entitled to an award of attorney's fees and expenses pursuant to the Guaranty Agreement and Leases as follows:

| | | |
|---|---|---:|
| Alexander | ($350/hour x 283.7[6] hours) | 99,295.00 |
| Wiles | ($350/hour x .80 hours) | 280.00 |
| Lynch | ($300/hour x 1.00 hour) | 300.00 |
| Marchant | ($225/hour x 6.40 hours) | 1,440.00 |
| Wagstaff | ($150/hour x 29.7 hours) | 4,455.00 |
| Paralegals | ($75/hour x 19.10[6] hours) | 1,432.50 |
| Alexander Ricks Expenses | | 2,592.44 |
| Mayer Brown Expenses | | 606.36 |
| **TOTAL AWARD:** | | **$110,401.30** |

---

[6]This figure represents the 33.5 hours that Mr. Alexander billed as an attorney with Mayer Brown and the 250.2 hours that he billed as an attorney with Alexander Ricks.

[6]This figure represents the 8.80 hours billed by paralegals at Mayer Brown and the 10.30 hours billed by paralegals at Alexander Ricks.

## V.    ORDER

For the foregoing reasons, **IT IS, THEREFORE, ORDERED** that Textron Financial Corporation's Motion Pursuant to Rule 56 for Partial Summary Judgment Against Seven Falls Golf and River Club, LLC and Against Keith Vinson and Paula Vinson [Doc. 44] is **GRANTED**, and judgment will be entered in favor of the Plaintiff Textron Financial Corporation as to liability and damages on Textron's breach of contract claims against the Defendants, jointly and severally, in the amount of $627,706.20.

**IT IS FURTHER ORDERED** that within thirty (30) days of the entry of this Order, the Plaintiff shall advise the Court in writing whether it intends to continue to prosecute its claim for conversion (Plaintiff's Second Claim for Relief in the Amended Complaint).  Unless the Plaintiff moves for dismissal of such claim pursuant to Fed. R. Civ. P. 41, such claim shall be tried during the Court's March 7, 2011 trial term in the Asheville Division.

**IT IS SO ORDERED.**

Signed: January 24, 2011

Martin Reidinger
United States District Judge